UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KRISTI LYNN LAUGHLIN | No. 3:13-cv-01402-AC |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| SOCIAL SECURITY ADMINISTRATION | |
| Defendant. | |

ACOSTA, Magistrate Judge:

    Plaintiff Kristi Lynn Laughlin ("Claimant") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Following a careful review of the record, the court affirms the Commissioner's decision.

OPINION AND ORDER - 1     [RMD]

*Procedural Background*

Claimant filed an application for DIB on August 17, 2010, alleging disability because of a gastrointestinal disorder beginning June 1, 2004. (Tr. at 19.) The Commissioner denied Claimant's application initially and on reconsideration. (Tr. at 19.) Claimant appeared at a hearing before Administrative Law Judge Wayne N. Araki ("the ALJ") on June 15, 2012, in Salem, Oregon. (Tr. at 19.) Thereafter, the ALJ issued an order finding Claimant was not disabled on or before December 31, 2006, her date last insured ("DLI"). (Tr. at 25.) Claimant now seeks review by this court of the ALJ's unfavorable decision.

*Factual Background*

Claimant was born and raised in Oregon, and at all times relevant to this review resided in Salem, Oregon. (Tr. at 33.) She has three children, two of which suffer from cerebral palsy. (Tr. at 44.) She graduated from high school and completed some college courses. (Tr. at 34.) Although she never completed her degree program, she attended Central Oregon Community College and focused on early childhood education. (Tr. at 34.) Between 1992 and 2004, Claimant held a number of jobs including: (1) office clerk for the Oregon Department of Agriculture; (2) tax collector for the Oregon Department of Revenue; (3) secretary; (4) court security guard; and (5) retail sales associate. (Tr. at 35-40.) However, Claimant left the work force when her first child was born in 2001, and She has not returned to work since. (Tr. at 48, 142-43.)

I. Medical Facts

In April 2004, Claimant began experiencing gastrointestinal distress and sought treatment from Lawrence K. Gates, Jr., MD ("Dr. Gates."). (Tr. at 634-37.) When Dr. Gates first began treating Claimant, she complained of abdominal pain and rectal bleeding. (Tr. at 637.) Thereafter,

her symptoms worsened. (Tr. at 626.) She started "feeling nauseated all of the time[,]" and experienced cramps, bloating, and diarrhea. (Tr. at 626.) Dr. Gates performed a colonoscopy and diagnosed Claimant with gastroparesis. (Tr. at 626.)

Prior to August 2004, Claimant could not take medication to control her symptoms because she was breastfeeding following the birth of her second child. (Tr. at 625.) However, by September, Claimant had stopped breastfeeding and Dr. Gates prescribed Claimant medication which yielded some positive results. (Tr. at 625.) In September 2004, Claimant reported "about 30% improvement in her symptoms" while on a medication called "Reglan." (Tr. at 625-26.) One month later, Claimant reported "a gradual improvement in her symptoms" and some weight gain, though she remained uncomfortable and experienced "a little nausea." (Tr. at 624.) Due to some negative side effects of Claimant's medication, Dr. Gates changed her medication regimen and prescribed dietary modifications to control her gastrointestinal symptoms. (Tr. at 624.)

Laughlin's symptoms persisted through 2005 and early 2006, albeit with some improvement. (Tr. at 619.) In October and November 2005, Dr. Gates reported in his notes that Claimant was still experiencing intermittent "loose stools with bleeding" and nausea during bowel movements. (Tr. at 619.) However, Dr. Gates also remarked that, with the exception of the intermittent loose stools, Claimant was "[o]therwise, . . . doing well." (Tr. at 619.) In January 2006, Dr. Gates reported Claimant was "generally doing well" and "had very few attacks" since the last time he examined her in November 2005. (Tr. at 617.)

Unfortunately, Claimant's condition declined yet again in late 2006. (Tr. at 617.) Dr. Gates reported in November 2006 that Claimant "got significantly worse" after she stopped breastfeeding her third child. (Tr. at 617.) Claimant reported nausea, vomiting, and extreme constipation. (Tr.

OPINION AND ORDER - 3                                                                                         [RMD]

at 617.) Dr. Gates ran a series of labs and prescribed Claimant a new medication, Zelnorm. (Tr. at 617.) During her final visit with Dr. Gates before her DLI, Claimant reported experiencing "substantial improvement on" Zelnorm. (Tr. at 614.) Soon thereafter, Zelnorm was pulled from the market, and despite taking new medications, Claimant's condition worsened significantly. (Tr. at 612.) By November 2007, Claimant had lost a significant amount of weight and, according to Dr. Gates, appeared chronically ill. (Tr. at 612.) By 2012, when she appeared before the ALJ, Claimant weighed ninety pounds and experienced constant, severe nausea. (Tr. at 50-52.)

In support of Claimant's DIB application, Dr. Gates rendered two written opinions discussing Claimant's condition and ability to perform work-related activities (the "Gates Letters"). (Tr. at 675-76.) The first letter, written on December 2, 2011, explains Claimant's symptoms and some of the treatments she has gone through in an attempt to remedy her condition. (Tr. at 676.) He opines that, due to her symptoms, Claimant's "functional capacity is markedly limited. She is limited to a sedentary lifestyle." (Tr. at 676.) He continues, "[s]he can sit for extended periods and can stand for brief periods but cannot really walk for more than about [fifteen] minutes at a time." (Tr. at 676.) The second opinion is a one-sentence, hand-written letter dated January 6, 2012. (Tr. at 675.) Dr Gates's one-sentence letter reads: "I would say that Ms. Laughlin could sit for up to [two] hours." (Tr. at 675.) In neither letter does Dr. Gates comment about Claimant's functional capacity during the period from June 2004 to December 2006, when her disability insurance expired ("the Covered Period").

At the request of the Commissioner, state-agency physicians Richard Alley, MD ("Dr. Alley") and Sharon B. Eder, MD ("Dr. Eder") reviewed Claimant's medical records and rendered an opinion regarding her disability during the Covered Period. (Tr. at 58-71.) Dr. Alley believed

OPINION AND ORDER - 4     [RMD]

that the medical evidence from the Covered Period did not support Claimant's statements about the severity of her symptoms. (Tr. at 61.) He observed that, although Claimant had some exertional limitations during the Covered Period, they were minor. (Tr. at 61.) Dr. Alley stated that Claimant was limited to: (1) occasionally carrying and lifting up to twenty pounds; (2) frequently lifting and carrying up to ten pounds; (3) Standing or walking for six hours in an eight-hour day; and (4) sitting for six hours during an eight-hour day. (Tr. at 61) Despite Claimant's limitations, Dr. Alley concluded Claimant was not disabled because she could perform past-relevant work as a clerk at the Oregon Department of Agriculture. (Tr. at 62-63.) Dr. Eder's report is almost identical to Dr. Alley's. (Tr. at 68-71.) Dr. Eder came to the same conclusion as did Dr. Alley regarding Claimant's exertional limitations, ability to perform past relevant work, and ultimate disability determination. (Tr. at 69-72.)

The record contains voluminous treatment notes from other physicians, but other than those discussed above, few pertain to the Covered Period. Even fewer of them are relevant to Claimant's gastrointestinal symptoms.

II. The ALJ's Findings

The ALJ engaged in the five-step "sequential evaluation" process for evaluating DIB claims. 20 C.F.R. § 416.920. The Claimant bears the burden of proof at steps one through four, but the burden of production shifts to the Commissioner at step five to identify jobs existing in significant numbers in the national economy that the claimant can perform despite his or her residual functional capacity, age, education, and work experience. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999). Each step is potentially dispositive. 20 C.F.R. § 416.920(a)(4).

*A. Steps One and Two*

At step one, the ALJ determined Claimant last met the "insured statues requirements" to qualify for DIB on December 31, 2006, and engaged in no substantial gainful activity during the Covered Period between Claimant's DLI and alleged onset date of June 1, 2004. (Tr. at 21.) At step two, the ALJ concluded that, through the DLI, Claimant suffered from a severe impairment: gastrointestinal disorder. (Tr. at 21.) The ALJ recognized, and briefly discussed, Claimant's allegations that she suffered from "cervical and low back pain." (Tr. at 21.) However, the ALJ concluded that "there is no objective medical evidence to show that these impairments were more than transient or that they caused significant vocational limitations." (Tr. at 21.) On that basis, the ALJ determined Claimant's back pain was non-severe. (Tr. at 21.)

*B. Step Three*

At step three, the ALJ concluded Claimant "did not have an impairment or combination of impairments that met or equaled" those listed in the pertinent regulations. (Tr. at 21.) In reaching that conclusion, the ALJ noted that, while Claimant suffers from serious gastrointestinal symptoms, they did not rise to the level required under "Section 5.00" for digestive system impairments. (Tr. at 21-22.) Further, the ALJ determined that, although she had lost significant weight since, Claimant's body mass index was within the normal range on her DLI and, thus, did not qualify as disabled on account of her weight loss. (Tr. at 22.)

*C. Residual Factional Capacity*

In the ALJ's Residual Functional Capacity Assessment ("RFC"), he concluded Claimant had the ability to perform a full range of light work during the covered period, subject to no exertional or nonexertional limitations. (Tr. at 22.) In making his RFC determination, the ALJ considered the

credibility of each witness on the record. (Tr. at 22-24.)

First, the ALJ first considered the Claimant's credibility. (Tr. at 22.) Although the "Claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," the ALJ did "not find all of the [C]laimant's symptom allegations to be credible prior to her date last insured." (Tr. at 22.) The ALJ observed Claimant originally left the workforce in 2001 "due to reasons other than her medical conditions." (Tr. at 22.) Further, the ALJ determined that Claimant's daily activities during the Covered Period were inconsistent with the alleged severity of Claimant's impairment. (Tr. at 23.) The ALJ explained, "[i]t is noted that the claimant was caring for two young children with cerebral palsy during the period at issue, as well as a newborn." (Tr. at 23.)

Second, the ALJ considered the credibility of Dr. Gates's opinion as expressed in the Gates Letters. (Tr. at 24.) The ALJ concluded that Dr. Gates's opinions were entitled to "little weight" because his "treatment notes . . . do not support the opined severity of [Claimant's] symptoms at the date last insured. The [C]laimant's condition appears to have increased in severity after this time." (Tr. at 24.) The ALJ instead chose to accord great credibility to Dr. Alley and Dr. Eder who concluded Claimant was not disabled at any time during the Covered Period. (Tr. at 24-25.)

*D. Step Four*

At step four, the ALJ determined that Claimant "was capable of performing past relevant [*sic*] work as a collection clerk, secretary, security guard, medical records clerk, general clerk, and retail sales[person]." (Tr. at 25.) Because Claimant was capable of performing past-relevant work during the Covered Period, she was not disabled as defined by the Social Security Act. (Tr. at 25.) On that basis, the ALJ denied Claimant's application for DIB. (Tr. at 25.)

*Discussion*

Claimant argues the court should reverse the ALJ's decision and remand for an immediate award of benefits. According to Claimant, the ALJ erred by: (1) Improperly rejecting the medical opinion of Dr. Gates; and (2) providing inadequate justification for rejecting the Claimant's credibility. The court concludes that the ALJ did not err and affirms his decision.

I. Dr. Gates's Medical Opinion

Claimant argues the ALJ erred by failing to provide legally sufficient justifications for rejecting the credibility of Dr. Gates. The Commissioner contends that the ALJ was fully justified in rejecting Dr. Gates's opinion and provided legally sufficient reasons for doing so. The court agrees with the Commissioner.

> The ALJ must "thoroughly justify" the decision to reject the opinion of certain physicians.
>
> Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians). As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant.

*Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995). In addition, courts afford greater weight to the opinion of examining physicians than those of non-examining physicians. *Id.*

Where a treating doctor's opinion is uncontroverted on the record, the court generally gives it controlling weight. *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005). "To reject an uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Id.* If, however, a treating or examining physician's opinion contradicts that of another doctor on the record, the ALJ may reject that

physician's opinion on the basis of specific and legitimate reasons supported by substantial evidence. *Id.* Moreover, an ALJ "need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Id.*

"The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d 830. As the Ninth Circuit held in *Gallant v. Heckler*, "the report of [a] non-treating, non-examining physician, combined with the ALJ's own observance of [the] claimant's demeanor at the hearing," did not constitute substantial evidence sufficient to reject the opinion of a treating or examining physician. 753 F.2d 1450, 1456 (9th Cir. 1984).

Dr. Gates opined in the Gates Letters that:

> Ms. Laughlin is an extremely unfortunate young woman who sees me for severe gastroparesis, constipation, intractable abdominal pain, nausea, and weight loss. . . . She currently weighs 91 pounds. She is severely underweight and malnourished. Her functional capacity is markedly limited. She is limited to a sedentary lifestyle. She can sit for extended periods and can stand for brief periods but cannot really walk for more than about 15 minutes at a time.

(Tr. at 676.) He continued in his second letter, "I would say that Ms. Laughlin could sit for up to 2 hours." (Tr. at 675.) The ALJ gave these opinions little weight because they contradict Dr. Gates's treatment notes. (Tr. at 24.)

The ALJ did not err by rejecting Dr. Gates's opinions. First, Dr. Gates's opinions, as expressed in the Gates Letters, are in present tense. Thus, they pertain primarily to Claimant's functional capacity in 2011 and 2012, when Dr. Gates wrote his opinion, and not to Claimant's ability to work during the Covered Period. Thus, the Gates Letters are largely irrelevant to the court's disability determination in this case. Second, to the extent Dr. Gates was expressing his

medical opinion regarding Claimant's condition during the Covered Period, it contradicts his treatment notes. Dr. Gates wrote that Claimant "is severely underweight and malnourished" and in generally poor health. However, Dr. Gates's treatment notes show that Claimant experienced "substantial improvement" while taking medication during the Covered Period. Dr. Gates reported in November 2005 that, apart from two episodes of loose stool with bleeding, Claimant was "otherwise . . . doing well." (Tr. at 619.) Further, in September 2004, Claimant experienced a 30% improvement in symptoms, and only a month later reported that she was "actually gaining weight." (Tr. at 624-25.) Even when Claimant's condition worsened during the Covered Period, her symptoms were not nearly as severe as they were at the time of the ALJ hearing, when Claimant weighed ninety pounds and had constant nausea, vomiting, and diarrhea.

Dr. Gates's opinion regarding the severity of Claimant's condition during the Covered Period contradict his treatment notes. This constitutes a clear and convincing reason for rejecting Dr. Gates's credibility. Therefore, the ALJ did not err by giving "little weight" to the Gates Letters.

II. Claimant's Testimony

Claimant next contends the ALJ erred by providing inadequate justification for rejecting Claimant's testimony regarding the severity of her symptoms. The ALJ did "not find all of the claimant's symptom allegations to be credible prior to her date last insured" because: (1) she left the work force "due to reasons other than her medical conditions;" (2) Her daily activities, particularly her ability to care for her children, are inconsistent with the claimed severity of Claimant's symptoms; and (3) Claimant's testimony is inconsistent with the treatment notes during the Covered Period. (Tr. at 22-23.) The court concludes the ALJ did not err by rejecting Claimant's testimony.

The ALJ may consider a number of factors in weighing a claimant's credibility, including: "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). Further, when the claimant's testimony deals with his or her subjective pain levels, the ALJ must perform a two-step process to evaluate the credibility of subjective testimony. *Id.* Step one requires the claimant to produce objective medical evidence of an impairment "that could reasonably be expected to produce some kind of symptom." *Id.* If the claimant meets his burden on the first step, the ALJ moves to step two, where he or she must accept the claimant's testimony as true unless there is affirmative evidence of malingering or the ALJ determines there are specific clear and convincing reasons for rejecting the claimant's credibility. *Id.*

### A. Claimant's Exit from the Workforce

First, the ALJ rejected Claimant's credibility first because Claimant exited the workforce in 2001 for reasons unrelated to her disability. "When a claimant's work history undercuts her assertions [regarding the severity of her symptoms], the ALJ may rely on that contradiction to discredit the claimant." *Savage v. Colvin*, No. 1:13-cv-01280-AA, 2014 WL 3778556, at *25 (D. Or. July 30, 2014) (*citing Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001)). In *Savage*, the ALJ determined the Claimant's employment history did "little to bolster the credibility of her claims" because she stopped working for reasons unrelated to her disability. *Savage*, 2014 WL 3778556, at *5. On review, the court affirmed the ALJ's decision, reasoning that "the record reflects

that plaintiff has not worked or attempted to work since shortly after the birth of her fourth child and considered herself a stay-at-home." *Id.* Because her employment history demonstrated a lack of motivation to work, the court concluded the ALJ did not err in rejecting Claimant's allegations regarding the severity of her condition. *Id.*

The ALJ did not err rejecting Claimant's credibility on this basis. Claimant worked consistently between 1987 and 2001, but left the workforce to give birth to, and care for, her first child. Here, as in *Savage*, the Claimant left the workforce to care for her children and never returned. Although Claimant has demonstrated a willingness to work throughout her life, the fact she did not attempt to seek employment after 2001 reasonably supports the conclusion she lacked motivation to return to work at that time. Further, at the 2012 administrative hearing before the ALJ, Claimant testified that she stopped working "when [she] found out that [her eldest son] had cerebral palsy, all the doctors' appointments up at Shriners . . . and all the therapies, there'd be no way" for her to continue working. (Tr. at 48.) The record demonstrates Claimant's absence from the workforce derived to a significant extent from her son's healthcare needs and not from her own medical condition. Similar to *Savage*, the ALJ in this case gave an adequate justification for rejecting Claimant's credibility.

### B. Activities of Daily Living

Second, the ALJ rejected Claimant's credibility because her ability to care for her children is inconsistent with allegations of severe disabling symptoms. Although she does not explain why this justification is legally insufficient, Claimant contends this does not constitute a clear and convincing reason for rejecting her testimony.

A claimant need not "vegetate in a dark room" to be eligible for social security benefits, and the court should not penalize a claimant for attempting to lead a normal life. *Cooper v. Bowden*, 815 F.2d 557, 561 (9th Cir. 1987). However, an ALJ may reject a claimant's testimony regarding his or her limitations if the claimant's daily activities are inconsistent with the alleged functional capacity. *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) ("[Claimant's] testimony was somewhat equivocal about how regularly she was able to keep up with [her daily activities], and the ALJ's interpretation of her testimony may not be the only reasonable one. But it is still a reasonable interpretation and is supported by substantial evidence; thus, it is not our role to second guess it.") The ALJ's justification strengthens if the claimant "is able to spend a substantial part of [his or] her day performing household chores or other activities that are transferable to a work setting." *Smolen v. Chater*, 80 F.3d 1273, 1284 n.7 (9th Cir. 1996).

At the time she testified before the ALJ, he Claimant had three children: a ten-year-old boy, an eight-year-old boy, and a six-year-old girl. (Tr. at 22.) Both of her sons suffer from cerebral palsy. Thus, during the Covered Period, Claimant was caring for two children with developmental disorders and a newborn. As the court has already discussed, Claimant left the work force in 2001 because "there'd be no way" to care for her first-born child while continuing to work. (Tr. at 48.) As Claimant's own testimony makes clear, raising one child with cerebral palsy was understandably taxing; so much so that Claimant was required her to leave the workforce. That burden was only amplified while trying to care for a second son with cerebral palsy and an infant daughter. The fact Claimant was able to care for her three children during the Covered Period undermines her allegation that her symptoms prevented her from engaging in substantial gainful activity. Because Claimant's daily activities are inconsistent with her allegations, the ALJ did not err in rejecting her credibility.

### C. *Consistency with Objective Evidence*

Third, the ALJ rejected Claimant's credibility because the treatment notes recorded during the Covered Period are inconsistent with the claimed severity of Claimant's symptoms. As explained above, the ALJ may engage in ordinary techniques of assessing a witness's credibility "such as weighing inconsistent statements regarding symptoms by the claimant." *Smolen v. Chater*, 80 F.3d 1284. Thus, it is not legally impermissible to give a claimant's testimony reduced weight because that testimony contradicts the objective medical evidence in the record. *Id.* However, the ALJ may not "make a negative credibility finding 'solely because' the claimant's symptom testimony 'is not substantiated affirmatively by objective medical evidence.'" *Stockwell v. Colvin*, No. 3:13-cv-01220-HZ, 2014 WL 6064446, at *3 (D. Or. Nov. 11, 2014).

Here, the ALJ did not err by discounting Claimant's testimony because it was inconsistent with the medical record. Claimant testified that during the Covered Period, her nausea, constipation, and fatigue rendered her utterly unable to perform most daily tasks around the house and is constantly tired. (Tr. at 49-51.) Claimant asserted she could stand only for twenty to thirty minutes at a time, and could not even take a shower without becoming fatigued to the point of exhaustion. (Tr. at 50-51.) These statements contrast with Dr. Gates's treatment notes during the Covered Period, which demonstrate that although Claimant was uncomfortable at times and suffered mild symptoms, her gastroparesis was largely controlled by medication. (Tr. at 614-29.) In fact, Claimant maintained a healthy weight during the Covered Period and reported improvements in her condition on several occasions during that time. (Tr. at 617, 619, 624, 625.) Because Claimant's testimony regarding the severity of her symptoms contradicts the medical records from the Covered Period, the ALJ did not err in rejecting Claimant's testimony.

*Conclusion*

Because the ALJ did not commit prejudicial error, the court AFFIRMS the Commissioner's decision and dismisses Claimant's case with prejudice (Dkt. No. 1).

This 20th day of January, 2015

                                                                        /s/ John V. Acosta
JOHN V. ACOSTA
United States Magistrate Judge